IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**KAYLA D. SPENCER,**                   Case No. 3:16 CV 2724

    Plaintiff,

    v.                                          Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                         MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Kayla D. Spencer ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Non-document entry dated February 13, 2017). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in October 2011, alleging a disability onset date of September 30, 2010. (Tr. 326-35). Her claims were denied initially and upon reconsideration. (Tr. 198-203, 208-12). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 213-14). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on August 21, 2013. (Tr. 76-120). On October 18, 2013, the ALJ found Plaintiff not disabled in a written decision. (Tr. 169-92). On April 6, 2015, the Appeals Council

remanded the case for another hearing. (193-96). In the remand order, the Appeals Council directed the ALJ to resolve the following issues:

- The hearing decision misstates the course of the claimant's psychiatric treatment. The hearing decision acknowledges the claimant's mental health treatment on page 10, citing to Exhibit 16F. However, the Administrative Law Judge concludes the residual functional capacity analysis by stating the claimant has not treated with a psychiatrist (Decision, page 13). Exhibit 16F contains the claimant's treatment records from Tiffin Psychiatry Center from August 2013 through October 2013.

- The Administrative Law Judge did not adequately evaluate the opinion of consultative examiner Jennifer Haaga, Psy.D. (Exhibit 5F). The Administrative Law Judge assigned the opinion some weight, initially indicating that it was a very detailed psychological evaluation. Subsequently, the Administrative Law Judge states that the opinion relies heavily on the claimant's subjective complaints (Decision, page 12). The consultative report from Dr. Haaga contains signs and findings offering support for her opinions, and, thus, it does not appear to be a mere restatement of the claimant's subjective complaints. Dr. Haaga completed a clinical interview of the claimant and reviewed both a physical therapy evaluation and function report (Exhibit 5F, page 1). Further evaluation is warranted, and weight must be assigned.

(Tr. 194).

Plaintiff (represented by counsel) and a VE testified at a second hearing on September 3, 2015 (Tr. 42-75), after which, on October 28, 2015, an ALJ again found Plaintiff not disabled (Tr. 16-41). On September 13, 2016, the Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on November 8, 2016. (Doc. 1).

**FACTUAL BACKGROUND**[1]

Personal and Vocational Background

Plaintiff was born in 1984 (Tr. 326), has a 12th grade education, was certified as a cosmetologist (Tr. 50-51, 362), but had not worked as a cosmetologist in the past fifteen years (Tr. 51). She has past work experience as a production assembler and carton catcher. (Tr. 70). As of the hearing date, she lived with her parents. (Tr. 49).

*Function Reports*

Plaintiff completed a function report in December 2011. (Tr. 377-84). She stated her anxiety "cause[d] [her] to get sick and very nervous when goin[g] around people" and her depression was "to the point were [sic] I don't want to leave or go outside". (Tr. 377). She added she felt sad and cried "all the time about [her] life." *Id.* Plaintiff stated she did not socialize[2], was unable to "handle" loud noises, and concentrating caused headaches that would last up to three days. *Id.*

In a typical day, Plaintiff wrote she woke up her children for school, fed them, and dropped them off at the bus stop. (Tr. 378). When she returned home, she cleaned and then laid down due to pain. *Id.* Plaintiff helped her children with their homework after she and her mom went to pick them from school. *Id.* She also took care of a dog and cat, but her children helped. *Id.* Plaintiff reported difficulty sleeping, dressing, bathing, shaving, and caring for her hair. *Id.*

Plaintiff could prepare her own simple meals, such as frozen foods and sandwiches, and prepare "complete meals" twice a week with her daughter's help. (Tr. 379). She cleaned (two to

---

1. Plaintiff challenges only the ALJ's findings as to her mental impairments. (Doc. 14, at 4 n.1). As such, the undersigned summarizes only the relevant records here. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in opening brief waived).
2. Although, later in the function report she stating she spend time with her mom and kids daily, and spoke with her sister twice a week. (Tr. 381).

four hours twice a week), and did laundry (three to five hours twice a week)—but needed help or encouragement to do these things. *Id.* She went outside daily, but only by herself "if [she] ha[d] to". (Tr. 380). She was able to drive or ride in a car. *Id.* Plaintiff shopped for groceries weekly, paid bills, handled a savings account, counted change, and used a checkbook/money orders. *Id.*

Plaintiff listed her hobbies and interests as watching television daily, reading, and doing puzzle books. (Tr. 381). However, she added she did not do puzzles or read anymore because they gave her headaches and she had difficulty concentrating. *Id.*; *see also* Tr. 67 ("I don't read anymore.").

She reported she could: pay attention for 30 minutes to an hour; follow written instructions as long as she could re-read them, but could not follow spoken instructions very well. (Tr. 382). She got along "okay" with others, "but it ma[de] [her] nervous." (Tr. 383). Plaintiff reported she did not handle stress or changes in routine very well. *Id.* She also said interacting with authority figures made her nervous (Tr. 383); she added she was never laid off from a job because of problems getting along with others. *Id.*

*Plaintiff's Testimony*[3]

Plaintiff testified at the remand hearing in September 2015. (Tr. 42-75). She stated she suffered from "severe depression" since age fourteen, "short-term memory loss" (Tr. 58), and anxiety (Tr. 60-61). Plaintiff stated her depression stemmed from being a single mother, and not being able to take care of her children following a motorcycle accident. (Tr. 58-59, 61). Plaintiff became overwhelmed by anxiety around people. (Tr. 61). She had been seeing "a psychiatrist and Dr. Rana" for the past three years. (Tr. 59). Plaintiff's parents reminded her of appointments, which

---

3. There was also extensive testimony regarding Plaintiff's physical impairments, but because she does not challenge the ALJ's findings with regard to such, that testimony is intentionally omitted here.

she forgot unless she wrote them down. (Tr. 67). She had difficulty following a television show due to concentration problems, and no longer read before bed. *Id.*

Relevant Medical Evidence

In December 2011, Plaintiff saw Bill Back, M.D., for a "basic medical visit for Social Security Disability". (Tr. 500). Plaintiff reported depression and anxiety her "whole life". *Id.* She reported past treatment for depression and anxiety, but Dr. Back noted that there was no documentation of it in her chart. *Id.* Dr. Back prescribed Celexa for depression. *Id.*

Plaintiff returned to Dr. Back the following month. (Tr. 499). Dr. Back noted her "depression [was] doing better" on Celexa, but "not working as well as at first", so he increased the dose. *Id.*

At a May 2012 appointment with Dr. Back, Plaintiff reported continuing depression, and increasing anxiety and panic attacks. (Tr. 498). Dr. Back prescribed Effexor XR in place of Celexa. *Id.* At a follow-up appointment in June 2012, Dr. Back noted Plaintiff "did well with the Effexor when she was taking [it]", but that her insurance would not cover the second prescription. *Id.* The following month, Plaintiff was "doing a lot worse" because she was unable to afford the Effexor. (Tr. 540). Dr. Back prescribed Cymbalta instead. *Id.*

In October 2012, Plaintiff was "tolerating Cymbalta well", and Dr. Back noted her depression was "stable". (Tr. 541). Plaintiff saw Dr. Back in November and December 2012 for physical impairments, and the notes reveal no discussion of or treatment for her mental impairments. (Tr. 542-43). A few months later, in January 2013, Plaintiff's depression was "worse lately", so Dr. Back increased the Cymbalta dose. (Tr. 544). Plaintiff saw Dr. Back again in February 2013, with no mention of mental impairments. (Tr. 545). In May 2013, Plaintiff reported

worsening depression, but no suicidal ideation, so Dr. Back referred her to Jatinder Rana, M.D., a psychiatrist. (Tr. 546).

In August 2013, underwent a psychiatric evaluation with Dr. Rana. (Tr. 595-96, 768). The mental status examination revealed Plaintiff was casually dressed with fair grooming and cleanliness. (Tr. 596). She had fair eye contact, but was tearful. *Id.* Plaintiff demonstrated a withdrawn demeanor; anxious and depressed mood; constricted affect; and spontaneous, clear, coherent, and relevant but slow speech. *Id.* She had a relevant and coherent thought process, and helpless thought content, reporting she was "sad all the time". *Id.*

Plaintiff saw Dr. Rana in September, October, and December 2013. (Tr. 597-98, 787). In September 2013, Plaintiff complained of continuing depression and tearfulness. (Tr. 597). Dr. Rana noted Plaintiff was alert and oriented, but related poorly with poor eye contact and a tense affect. *Id.* Her speech was abrupt and low in volume and tone. *Id.* Plaintiff had satisfactory impulse control and no psychosis. *Id.* Dr. Rana increased Plaintiff's Wellbutrin dose, and prescribed Celexa and Cymbalta. *Id.* In October 2013, Plaintiff had "some improvement in her mood." (Tr. 598). She was alert and oriented; demonstrated good grooming and hygiene; related poorly; had a constricted affect; had a "less depressed" mood; satisfactory impulse control; organized thoughts; and no psychosis. *Id.* Dr. Rana continued the medications, but noted: "As patient continues to do well, plan will be to decrease and discontinue Celexa." *Id.* Plaintiff also saw Dr. Back in October 2013, and reported Wellbutrin was helping with her depression and she was sleeping better with Elavil. (Tr. 612). In December 2013, Dr. Rana noted Plaintiff had missed her last appointment, was "running low on Wellbutrin", and "had not been taking it regularly." (Tr. 787). Plaintiff said she felt behind on chores for the holiday season. *Id.* She was alert and oriented; related poorly; had poor eye contact; slouched posture; depressed mood; constricted affect; satisfactory impulse

6

control; no hallucinations; and no suicidal or homicidal thoughts. *Id.* Dr. Rana continued her medication and advised her to stay complaint with them. *Id.*

On February 7, 2014, Plaintiff's therapist, Patricia Abrahamson, wrote a letter summarizing her treatment. (Tr. 768). She reported Plaintiff had begun counseling with her on December 3, 2013, and had attended two sessions thus far. *Id.* She added Plaintiff began treatment with Dr. Rana on August 13, 2013, and had seen her six times. *Id.* Ms. Abrahamson noted Plaintiff continued to take Wellbutrin, Celexa, and Cymbalta, but had reported to Dr. Rana that she did not always take them as prescribed. *Id.*

Plaintiff had a follow-up visit with Dr. Rana in March 2014. (Tr. 788). Dr. Rana noted: "Mood wise, patient stated that her symptoms are mild in intensity, she seems to be tolerating the medication well and mood had been better apart from her being worried about her physical health." *Id.* Plaintiff was alert and oriented, with normal speech, satisfactory impulse control, good grooming and hygiene, intact memory and cognition, and no suicidal or homicidal thoughts. *Id.* Dr. Rana continued her medications of Wellbutrin, Cymbalta, and Celexa. *Id.*

During a June 2014 follow-up appointment with Dr. Rana, Plaintiff complained of difficulty sleeping, and moderate to severe depression and anxiety. (Tr. 789). Dr. Rana noted "there ha[d] been no worsening in her mood", and Plaintiff thought Cymbalta and Wellbutrin were working well, but did not notice much change with the addition of Celexa. *Id.* Dr. Rana continued Wellbutrin and Cymbalta and began reducing Plaintiff's Celexa dose. *Id.*

In September 2014, Plaintiff reported to Dr. Rana that she was having financial problems and received no support from her children's father. (Tr. 790). She also said she was taking all of her medications as prescribed, but was experiencing racing thoughts, trouble sleeping, tearfulness, helplessness, and frustration. *Id.* Dr. Rana added Seroquel to her medications, and noted "[s]he is

7

not able to work herself." *Id.*; *see also* Tr. 454 (a September 17, 2014 note from Dr. Rana indicating Plaintiff was unable to work due to severe depression).

Plaintiff had a follow-up visit with Dr. Rana in November 2014. (Tr. 791). She reported taking her medication as prescribed, that she was less depressed and frustrated, and had decreased mind racing and improved sleep. *Id.* She also did not have any hopelessness or helplessness. *Id.* Plaintiff was alert and oriented, her mood was stable, she had a constricted affect, she related well, and she denied any hallucinations or suicidal thoughts. *Id.* Dr. Rana noted she was "not tearful or overly depressed", and decreased her Seroquel dose. *Id.*

Five months later, in April 2015, Plaintiff returned to Dr. Rana. (Tr. 792). She complained of severe symptoms of depression and anxiety, but had not taken her medications for about a week prior. *Id.* Plaintiff stated she experienced frequent crying episodes and was irritable. *Id.* She also reported experiencing additional stress due to an upcoming court date related to her daughter. *Id.* Dr. Rana noted Plaintiff related poorly, had poor eye contact, depressed mood, labile affect, and was tearful and sobbing. *Id.* Dr. Rana added Depakote for mood stabilization and ruled out bipolar disorder. *Id.*

In June 2015, Plaintiff reported to Dr. Rana she felt tired with Seroquel and still had mood lability and irritability, and still got very frustrated. (Tr. 793). She denied feelings of hopelessness or helplessness, and crying episodes. *Id.* Dr. Rana added Trazodone and continued Wellbutrin, Cymbalta, and Seroquel. *Id.* Dr. Rana also wrote a note stating Plaintiff was unable to work from June 2015 to September 2015. (Tr. 799).

Plaintiff saw Dr. Rana in August 2015, for follow up, and reported she still had some difficulty sleeping, but that her depression and anxiety seemed to be improving. (Tr. 794). Her mood was depressed, but she was alert and oriented, her speech was goal-directed, she related

well, and she denied suicidal thoughts. *Id.* Dr. Rana maintained Wellbutrin and Cymbalta, kept decreasing Plaintiff's Seroquel, and increased Trazodone. *Id.* At another visit later that month, Plaintiff stated her medications, which she had been taking as prescribed, were helping. (Tr. 795). Her mood was improving, as she was less anxious and depressed, but her physical symptoms were making her anxious. *Id.* Plaintiff was alert, oriented, and polite in her interactions, her mood was stable, her speech was goal-directed, and she denied suicidal thoughts. *Id.*

During a September 2015 follow-up visit with Dr. Rana, Plaintiff reported taking her medications as prescribed, noticed an improvement in her demeanor, and was "not as depressed" but continued to have crying spells. (Tr. 796). She added she had been having difficulty remembering things and staying organized. *Id.* Dr. Rana noted Plaintiff related poorly, had poor eye contact, a depressed mood, and was anxious and tearful. *Id.* Dr. Rana added the diagnosis of memory problems, but ruled out a traumatic brain injury. *Id.* He continued Cymbalta, Trazodone, and Wellbutrin, and advised Plaintiff to follow up in seven to eight weeks. *Id.*

Opinion Evidence

*Treating Physician*

In September 2014, Dr. Rana stated Plaintiff was unable to work. (Tr. 790). He wrote a note dated September 17, 2014, stating she was unable to work due to severe depression. (Tr. 454). Dr. Rana also wrote a note stating Plaintiff was unable to work from June 8, 2015 to September 8, 2015. (Tr. 799).

*Consultative Examiner*

Jennifer Haaga, Psy.D., performed a consultative mental examination in January 2012. (Tr. 487-94). Dr. Haaga noted Plaintiff had "never been formally diagnosed with anything" and had "never been psychiatrically hospitalized." (Tr. 489). Plaintiff noted she spent her day laying on the

couch watching television or "trying to read a book." (Tr. 490). She did chores "when she [could]", managed her own finances, and was able to drive a car. *Id.*

Plaintiff was cooperative and appropriately dressed, her speech and thought content were normal, her attention and concentration were fair, and she had logical, coherent, and goal-directed thought processes. (Tr. 490-91). She demonstrated "no motor manifestations of anxiety", adequate common sense reasoning and judgment, adequate insight, good motivation, and appeared "cognitively and psychologically capable of living independently and of making decision about her future." *Id.*

Dr. Haaga diagnosed Plaintiff with major depressive disorder, generalized anxiety disorder; and social phobia. (Tr. 491-92). She assigned a global assessment of functioning ("GAF") symptom score of 51 and an overall score of 41.[4] (Tr. 492). Dr. Haaga concluded Plaintiff had a moderate impairment in her ability to understand, remember, and follow instructions, and could comprehend and complete simple routine tasks, although she could experience difficulty if the tasks became more complex. (Tr. 493). She also opined that Plaintiff had a marked limitation in attention, concentration, persistence, and pace, and would have significant difficulty with

---

4. The GAF scale represented a "clinician's judgment" of an individual's symptom severity or level of functioning. Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders,* 32–33 (4th ed., Text Rev.2000 ("*DSM-IV-TR*")). "The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale." *Judy v. Colvin,* 2014 WL 1599562, at *11 (S.D. Ohio); *see also* Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM—V") (noting recommendations "that the GAF be dropped from [DSM-V] for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice"). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)" *DSM-IV-TR* at 34. A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers)". *Id.*

attention and concentration if demands became "too great". *Id.* Dr. Haaga found Plaintiff was moderately impaired in her ability to relate to others, although she was able to interact adequately during the evaluation and described good family relationships. *Id.* She also opined that Plaintiff had a marked impairment in her ability to withstand stress and work pressures, but could be better at handling these things based on her positive family relationships. (Tr. 492-93).

*State Agency Reviewers*

In January 2012, state agency reviewing physician Caroline Lewin, Ph.D., reviewed the record and determined Plaintiff had moderate limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. (Tr. 125-29, 135-39). Dr. Lewin noted Plaintiff had not experienced any repeated episodes of decompensation of extended duration. (Tr. 126, 136). She added Plaintiff was capable of cooperating with others, coping with simple instructions, and short-term concentration in a low stress setting without an unduly rapid pace of production. (Tr. 129, 139). She also opined Plaintiff "may occasionally need some extra supervision on new challenging tasks." (Tr. 129, 139).

In July 2012, state agency reviewing physician David Demuth, M.D., affirmed Dr. Lewin's findings. (Tr. 146-47, 150-52, 160-61, 164-66). He concluded Plaintiff was capable of performing routine one and two-step tasks that were routine in nature, with limited interaction with others and where changes were clearly explained. (Tr. 152, 166).

<u>VE Testimony</u>

A VE testified at the hearing. (Tr. 69- 74). She testified that an individual of Plaintiff's age, education, and work experience who was limited to Plaintiff's ultimate RFC, could not perform her past work but could adjust to other work available in the national economy. (Tr. 71-74).

ALJ Decision

On October 28, 2015, an ALJ issued an unfavorable notice of decision, in which he made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2013.

2. The claimant has not engaged in substantial gainful activity since September 30, 2010, the alleged onset date.

3. The claimant has the following severe impairments: major depressive disorder; social phobia; anxiety disorder; and lumbar radiculopathy.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work . . . , except: she can never climb ladders, ropes or scaffolds; she can frequently stoop, kneel, crouch and crawl; she can occasionally reach overhead; she can frequently feel, handle and finger with the right extremity; she must avoid hazards such as unprotected heights, commercial driving, and dangerous machinery; with respect to understanding, remembering and carrying out instructions,[5] she is limited to performing simple, routine and repetitive tasks, with few if any workplace changes, in an environment without fast-paced production requirements; she can have only occasional interaction with coworkers, supervisors and the public; and her work assignments should not require interaction with coworkers.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born [in] . . . 1984 and was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.

---

5. Plaintiff does not challenge the physical limitations in the RFC.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 30, 2010, through the date of this decision.

(Tr. 16-33) (internal citations omitted).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred by failing to incorporate all of the limitations in Dr. Haaga's opinion, which he gave great weight, in the RFC. The first ALJ gave Dr. Haaga's opinion some weight, and the Appeals Council remanded the case for a second administrative hearing for the ALJ to further consider Dr. Haaga's opinion (Tr. 194-96). The second ALJ gave the opinion "great weight", but Plaintiff argues the RFC was "essentially the same". ((Doc. 18, at 5). Defendant

responds the ALJ properly considered Dr. Haaga's opinion in his RFC assessment and the case should be affirmed as it is supported by substantial evidence. (Doc. 16, at 14-21).

Initially, the undersigned notes that when the Appeals Council declines to review the ALJ's decision, the ALJ's decision becomes the Commissioner's final decision. *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). While new and material evidence may be submitted for consideration to the Appeals Council, "we still review the ALJ's decision, not the denial of review by the appeals council." *Casey v. Sec'y*, 987 F.2d 1230, 1233 (6th Cir. 1993). The undersigned, therefore, reviews the October 28, 2015, notice of decision, which is the final decision of the Commissioner in this case. (Tr. 16-41).

With regard to Dr. Haaga's opinion, the ALJ stated:

On January 17, 2012, the claimant underwent a consultative psychological examination by Jennifer Haaga, Psy.D. (5F). The claimant described depressive symptoms and anxiety when around groups of people. She had a depressed mood and flat affect, with slowed psychomotor activity, but normal speech and thoughts, and no signs of psychosis or motor manifestations of anxiety. Her attention and concentration were fair and her cognitive functioning average upon testing, but she had some difficulty with her recent memory. Her insight and judgment appeared adequate. Dr. Haaga diagnosed a major depressive disorder, single episode, severe, without psychotic features; a generalized anxiety disorder; and social phobia. She concluded the claimant has a moderate impairment in understanding, remembering and carrying out instructions; a marked impairment in maintaining attention, concentration, persistence and pace; a moderate impairment in responding appropriately to supervisors and coworkers; and a marked impairment in responding appropriately to work pressures. She did not opine that the claimant is incapable of working. (*Id.*). Dr. Haaga's opinion is consistent with the evidence of record as a whole, and it is supported by a detailed explanation. Her evaluation of the claimant was quite thorough. Therefore, I have given her opinion great weight. The restrictions on work complexity, changes, pace, and interpersonal interactions in the assessed residual functional capacity accommodate the limitations described by Dr. Haaga.

Dr. Haaga also estimated the claimant's global assessment of functioning (GAF) as 51 based upon her symptoms and 41 based upon her functioning, indicating a moderate to severe level of symptoms (5F). She concluded the claimant's overall GAF score was 41 (*Id.*). To the extent these GAF scores may constitute opinion evidence for the purposes of this decision, they have been given little weight, as a

> GAF score is not purely, or even primarily, an evaluation of psychological limitations in the sense used by the Social Security Administration. Rather, the GAF is comprised of three factors – "psychological, social and occupational functioning" (DSM-IV, p. 30). [citation omitted]. In this case, Dr. Haaga noted on Axis IV that the claimant had numerous stressors, including lack of employment and income, health insurance issues, and educational problems, that contributed to her GAF score (5F), none of which elucidate the actual functional effects of her mental impairments. It does not follow, therefore, that a GAF score indicating serious symptoms translates directly into extreme or marked degrees of limitation on the functional limitation scale used by Social Security in evaluating the "paragraph B" criteria. Additionally, the DSM-IV points out the GAF score is of particular use "in tracking the clinical progress of individuals" (DSM-IV, p. 30). But Dr. Haaga, as a consultative examiner, met with the claimant only once. She was not tracking the claimant's progress. This one-time interview can be considered to provide a snapshot of the claimant's condition, including all of the social and occupational as well as psychological factors, but a low GAF score in and of itself does not show the claimant has an ongoing disability under Social Security regulations.

(Tr. 29-30).

First, the ALJ did incorporate some of Dr. Haaga's limitations into the RFC determination. For example, Dr. Haaga determined Plaintiff had moderate impairments in her ability to understand, remember, and carry out instructions, and could comprehend and complete simple routine tasks, but would have "difficulties remembering novel instructions, particularly if a previous routine has been changed." (Tr. 493). Dr. Haaga also found Plaintiff had a marked impairment in her ability to maintain attention, concentration, persistence, and pace to perform routine tasks. (Tr. 493). In the RFC, the ALJ determined Plaintiff could perform simple, routine, and repetitive tasks, and could not work with fast-paced production requirements. (Tr. 25). Dr. Haaga found Plaintiff was moderately impaired in her ability to relate to others, including coworkers and supervisors. (Tr. 493). The ALJ found Plaintiff could have only occasional interaction with coworkers, supervisors, and the public, and should not be assigned tasks requiring coworker interaction (Tr. 25). Finally, Dr. Haaga found Plaintiff had a marked limitation in her

16

ability to respond appropriately to work pressures. (Tr. 493-94). The ALJ also found Plaintiff was limited to few, if any, workplace changes. (Tr. 25).

Second, to the extent Dr. Haaga's opinion is inconsistent with the ALJ's RFC, an ALJ is not required to adopt every limitation opined by a physician, even one to which he assigns "great weight". *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."); *see also Roy v. Comm'r of Soc. Sec.*, 2015 WL 1286398, at *4 (S.D. Ohio) (finding it is not error to exclude a restriction from an examining physician's opinion, even when that opinion was given "significant weight").

Plaintiff argues a limitation to simple repetitive work fails to address the assessment of a limitation in concentration and persistence. (Doc. 18, at 3-4). She cites *Ealy v. Comm'r of Soc. Sec.*, 594 F. 3d 504 (6th Cir. 2010) and *Cheeks v. Comm'r of. Soc. Sec.*, 690 F. Supp. 2d 592, 602 (E.D. Mich. 2009) for support. (Doc. 18, at 3-4). However, *Ealy* and *Cheeks* are distinguishable because they discuss a hypothetical question posed to the VE that failed to accurately include Plaintiff's limitations. If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy*, 594 F.3d at 516-17. However, that is not the issue here. Instead, here, the ALJ was not required to adopt Dr. Haaga's limitations verbatim, even though he gave the opinion great weight. Even so, he included mental limitations in the RFC that are consistent with Dr. Haaga's opinion, including limiting Plaintiff to performing simple, routine and repetitive tasks, with few if any workplaces changes, without fast-paced production requirements, occasional interaction with others, and work that did not require interaction with coworkers. (Tr. 25).

Third, the ALJ's decision to discredit the GAF score was appropriate as well, as GAF scores are not determinative of disability. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). In fact, "[t]he most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale." *Judy,* 2014 WL 1599562, at *11; *see also* DSM-V, at 16 (noting recommendations "that the GAF be dropped from [DSM-V] for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice").

Third, the ALJ also adequately considered psychiatric treatment records, *see* Tr. 29, including those from Tiffin Psychiatry Center, *see* Tr. 29 (citing Exhibit 16F), as specifically directed by the Appeals Council (Tr. 194).

Thus, the ALJ did not err by failing to incorporate Dr. Haaga's limitations verbatim in the RFC determination. *also* SSR 96-5p, 1996 WL 374183, *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the [RFC] assessment."); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) ("To require the ALJ to base her RFC finding on a physician's opinion, 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'") (quoting SSR 96-5p, 1996 WL 374183, at *2); *Henderson v. Comm'r of Soc. Sec.*, 2010 WL 750222, *2 (N.D. Ohio) ("[T]he ALJ is charged with evaluating several factors in determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony.").

Although "[i]t is well established that the ALJ may not substitute his medical judgment for that of the claimant's physicians", *Brown v. Comm'r of Soc. Sec.*, 2015 WL 1431521, *7 (W.D. Mich.) (citing *Meece v. Barnhart*, 192 F. App'x 181, 194 (6th Cir. 2009)), "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009); *see also* 20 C.F.R. § 404.1527(d)(2) ("Although we consider opinions from medical sources on issues such as [a claimant's RFC] . . . . the final responsibility for deciding these issues is reserved to the commissioner"). The undersigned, therefore, finds the ALJ complied with the remand order by adequately evaluating the medical psychiatric evidence, including the opinion of Dr. Haaga, and the resulting RFC is supported by substantial evidence in the record. The ALJ did not err.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI supported by substantial evidence and affirms that decision.

  s/James R. Knepp II
United States Magistrate Judge